

1 | DAMIEN M. SCHIFF, No. 235101
E-mail: dms@pacificlegal.org
2 | JONATHAN WOOD, No. 285229
E-mail: jw@pacificlegal.org
3 | Pacific Legal Foundation
930 G Street
4 | Sacramento, California 95814
Telephone: (916) 419-7111
5 | Facsimile: (916) 419-7747

6 | Attorneys for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT

JUL 3 1 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

RECEIVED
CLERK, U.S. DISTRICT COURT

JUL 3 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CALIFORNIA SEA URCHIN
COMMISSION; CALIFORNIA ABALONE
ASSOCIATION; CALIFORNIA LOBSTER
AND TRAP FISHERMEN'S
ASSOCIATION; and COMMERCIAL
FISHERMEN OF SANTA BARBARA,

Plaintiffs,

v.

RACHEL JACOBSON, in her official
capacity as Acting Assistant Secretary for
Fish & Wildlife & Parks, Department of
Interior; DEPARTMENT OF INTERIOR;
DANIEL M. ASHE, in his official capacity
as Director of the United States Fish &
Wildlife Service; and UNITED STATES
FISH & WILDLIFE SERVICE,

Defendants.

No. CV 13-05517-DMG CWx

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiffs bring this action for declaratory and injunctive relief against Defendants Rachel Jacobson, *et al.* (collectively "Service"), to protect their livelihoods from the devastation of the California sea otter. At the turn of the twentieth century, the otter was on the brink of extinction, due to habitat loss and hunting. But, following a century of federal and state hunting bans, the otter has

Complaint

- 1 -

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

made significant progress toward recovery. With the otter's recovery, however, comes the possibility for significant harm to various Southern California fisheries which the otter, through range expansion, may ravage. In 1986, Congress struck a balance between otter and fishery protection by authorizing the Service to try to expand the otter's range to San Nicolas Island, but to keep the rest of the California Bight as an otter-free management zone. Pub. L. No. 99-625, 100 Stat. 3500 (1986). In December of last year, the Service violated this Congressionally authorized compromise by ending the management zone. For the reasons set forth below, Plaintiffs seek a declaration that the Service's termination of the otter management zone is illegal, and an injunction requiring the Service to continue to observe and abide by the Congressionally mandated compromise. Pursuant to Local Rule 8-1, the grounds for the Court's jurisdiction over Plaintiffs' cause of action are 28 U.S.C. § 1331 (federal question jurisdiction); § 1346(a)(2) (civil action against the United States); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act).

## PARTIES

### Plaintiffs

2.     Plaintiff California Sea Urchin Commission is an entity of state government, created by the California Legislature in 2004. Cal. Food & Agric. Code § 79040. The Commission's purpose is to promote legislation that protects sustainable sea urchin harvest, to make consumers and the general public aware of the high nutritional value of sea urchin, and to balance sea urchin harvest with environmental protection. *See id.* § 79002. The Commission has the power to sue and be sued. *Id.* § 79052.

3.     Since its creation, the Commission has been gravely concerned with the negative impacts of otter predation upon shellfish. Within the last decade, the vast majority of sea urchin harvest in California has occurred in the otter management

Complaint

- 2 -

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  zone.  The Channel Islands sea urchin resource alone is responsible for 68% of

2  California's harvest.

3      4.    Sea urchin is a favorite of the otter.  *See* U.S. Fish & Wildlife Service,

4  Final Supplemental Environmental Impact Statement:  Translocation of Southern

5  Sea Otters 87 (Nov. 2012) (SEIS) ("Sea urchins are favored prey for sea

6  otters . . . .").  When an otter moves into a new area, it generally will devour the

7  urchin population before selecting other prey.  A significant body of research has

8  established that, once the otter moves into sea urchin territory, the commercial

9  urchin resource will collapse owing to the otter's voracious predation.  *See, e.g.*,

10 U.S.  Fish  &  Wildlife  Service,  Final  Environmental  Impact  Statement

11 for  Translocation  of  Southern  Sea  Otters  App.  B  at  2  (May  1987)  (EIS)

12 ("[T]he  prevailing  view  among  scientists  is  that  sea  otters  limit  populations

13 of . . . sea urchins . . . to such low levels that commercial and recreational

14 fisheries  for  [the]  species  are  reduced  or  eliminated."),  *available  at*

15 http://www.fws.gov/ventura/species_information/so_sea_otter (last visited July 19,

16 2013).

17     5.    Consequently, the Commission has a strong interest in protecting the

18 otter management regime that Congress authorized through Public Law 99-625.  The

19 Commission submitted extensive comments to the Service on its draft environmental

20 impact statements and proposal to terminate the translocation program, including the

21 management zone.  *See* SEIS App. G at 83.  In those comments, the Commission

22 objected strongly to the Service's proposal, highlighting the profoundly negative

23 impacts that unregulated otter range expansion into the management zone would

24 have on Southern California's marine ecology and economy.

25     6.    Plaintiff California Abalone Association is a non-profit California

26 corporation.  Formed in 1971, the Association's mission is to restore and steward

27 a market abalone fishery in California that utilizes modern management concepts,

28 protect and enhance the resource, and guarantee a sustainable resource for the

Complaint

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  future. The Association's many dozens of members held commercial abalone diving

2  permits in 1997, the year the State of California enacted the abalone fishing

3  moratorium. *Cf.* Cal. Fish & Game Code §§ 5521, 5521.5. Although the abalone

4  resource is improving, otter predation related to the species' expansion into the

5  management zone will prevent the resource from reaching a minimum viable

6  population, which is required for the moratorium to be lifted and for the resource to

7  be sustainable. *Cf. id.* § 5522(d).

8       7.    Plaintiff California Lobster and Trap Fishermen's Association is a non-

9  profit association that advocates for a sustainable lobster resource and the fishermen

10  and communities that depend on the resource.  The organization is gravely

11  concerned about unregulated otter expansion and the loss of the incidental take

12  exemption, due to otter consumption of lobster and the risks that traps will

13  unintentionally "take" the otter. The termination of the otter management program

14  therefore directly threatens the Association's and its members interests.

15       8.    Plaintiff Commercial Fishermen of Santa Barbara is a non-profit

16  corporation organized to integrate regional efforts of fishing communities with the

17  aim of improving the economic and biological sustainability of fisheries.  The

18  organization aims to maintain California's fishing heritage, to improve fisheries

19  management where needed, and to contribute to the improvement of ocean health.

20  The organization is gravely concerned about unregulated otter expansion, both due

21  to otter depletion of shellfish and other fisheries, as well as the legal risks of fishery

22  harvest causing illegal "take" of otter.  The termination of the otter management

23  program therefore directly threatens the organization's and its members interests.

### Defendants

25       9.    Defendant Rachel Jacobson is sued in her official capacity as Acting

26  Assistant Secretary for Fish and Wildlife and Parks, Department of Interior.  On

27  information and belief, Plaintiffs assert that Secretary Jacobson's predecessor was

28  delegated authority by the Secretary of the Department of Interior to approve the

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  decision to terminate the otter management zone, and that her predecessor exercised
2  that authority.

3    10.   Defendant Department of Interior is the federal agency designated by
4  Public Law 99-625 to create the otter management zone. *See* Pub. L. No. 99-625,
5  § 1(a)(6).

6    11.   Defendant Daniel M. Ashe is sued in his official capacity as Director
7  of the United States Fish and Wildlife Service.   Director Ashe has primary
8  responsibility for the Service's proposal to terminate the otter management program.

9    12.   Defendant United States Fish and Wildlife Service is the federal agency
10  principally responsible for maintaining the otter management zone. *See* Pub. L. No.
11  99-625, § 1(a)(7).

**VENUE**

13    13.   Venue in this district is predicated upon 5 U.S.C. § 703 and 28 U.S.C.
14  § 1391(e)(1), in that a substantial part of the events or omissions giving rise to the
15  claim occurred in this District, and several Plaintiffs reside in the district.  Venue is
16  proper in the Western Division of this District pursuant to 28 U.S.C. § 84(c)(2).

**BACKGROUND**

*The California Sea Otter*

19    14.   The California sea otter (also known as the southern sea otter) is one
20  of three subspecies of otter.  Unlike most marine mammals, the otter lacks blubber.
21  Consequently, the otter must keep warm by maintaining a very high metabolism,
22  consuming from 23% to 33% of its body weight per day. SEIS at 48.  The otter also
23  relies on its dense pelage (some 650,000 follicles per square inch, U.S. Fish &
24  Wildlife Service, Final Revised Recovery Plan for the Southern Sea Otter 5
25  (2003), *available at* http://www.fws.gov/ventura/species_information/so_sea_otter/
26  ssorecplan.pdf (last visited July 26, 2013)) as a blubber substitute to keep warm.
27  SEIS at 48.

28  ///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

15.    Otter pelage has attracted fur hunters for centuries, and that hunting greatly reduced the population.  To prevent extinction, otter hunting bans were enacted in the early 1900s.  *See* Fur Seal Treaty of 1911, 37 Stat. 1542, 1543 (July 7, 1911); EIS App. H at 1 (citing Cal. Fish & Game Code § 4700).  Since then, the otter has made a significant comeback.  *See* 42 Fed. Reg. 2965, 2966 (Jan. 14, 1977) ("[T]here also seems no doubt that the Southern Sea Otter has made a comeback from a formerly much more dangerous status."); SEIS at 51 ("[T]he geographic range of the southern sea otter has expanded considerably since 1938 . . . ."); Revised Recovery Plan at 1 ("[T]he southern sea otter is regarded as a subspecies with a moderate level of threat but a high potential for recovery.").  In fact, the most recent estimate reveals that the otter's population is approximately 88% of that needed for recovery.  *See* SEIS App. G at 10.

16.    The otter's voracity, however, can have significant impacts on various prey species, such as abalone, sea urchin, and lobster.  *See* SEIS at 31.  Naturally, the otter's progress towards recovery exacerbates these impacts.  "Numerous reports exist of sea urchin, crab, and clam populations declining once sea otters enter an area."  SEIS App. B at B-23.  *See also* EIS App. A at A-8 ("Sea otters are known to reduce and effectively limit populations . . . such as abalone, clams, and sea urchins . . . .").  Decades ago, the Service acknowledged that, without "action . . . taken to control [otter] population growth and continued range expansion, the shellfisheries of the entire Southern California Bight . . . could be at risk."  EIS at IV-82.

### California Sea Otter Regulation and Recovery Efforts

17.    In 1972, Congress enacted the Marine Mammal Protection Act.  86 Stat. 1027 (Oct. 21, 1972), 16 U.S.C. § 1361, *et seq*.  The Act imposes a moratorium on the "take" of all marine mammals, including the otter, within the jurisdiction of the United States.  *See id.* § 1371(a).  The Act defines "take" as "to harass, hunt,

///

1  capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.*

2  § 1362(13).

3      18.   In 1973, Congress passed the Endangered Species Act. Pub. L. 93-205,

4  87 Stat. 884 (Dec. 28, 1973), 16 U.S.C. § 1531, *et seq.* Like the Marine Mammal

5  Protection Act, the Endangered Species Act forbids the "take" of protected species.

6  *See id.* § 1538(a). Its scope, however, is broader. For example, the Endangered

7  Species Act applies to any "species," *id.* § 1532(16), of plant or wildlife that is

8  determined to be "endangered," *id.* § 1532(6), or "threatened," *id.* § 1532(20), with

9  extinction, *see id.* § 1533(a).

10      19.   In 1977, the Service listed the otter as a "threatened species." 42 Fed.

11  Reg. 2965 (Jan. 14, 1977). The main threats that the Service identified to justify the

12  listing were habitat loss and hunting-related population decline, as well as the risks

13  posed by a Southern California oil spill. *See id.* at 2966-67. Today, however, the

14  Service believes that the two most important causes of otter death are white shark

15  attacks and infectious disease. SEIS at 54.

16      20.   With its listing under the Endangered Species Act, the otter

17  automatically was deemed a "depleted stock" under the Marine Mammal Protection

18  Act. 16 U.S.C. § 1362(1)(C).

19      21.   In 1982, the Service published a recovery plan for the otter. *See* 52

20  Fed. Reg. 29,784, 29,785 (Aug. 11, 1987) (discussing the plan). The plan

21  envisioned the establishment of at least one additional "experimental population"

22  of otter to facilitate the otter's recovery. *Id.* (At least five prior attempts at

23  translocation, of varying success, had been essayed. *See* EIS App. B at B-6 to B-7;

24  *id.* App. I at 9.) The Endangered Species Act authorizes the Service to establish an

25  experimental population if it would "further the conservation of such species." 16

26  U.S.C. § 1539(j)(2)(A).

27      22.   The 1982 recovery plan "identified the translocation of southern sea

28  otters as an effective and reasonable recovery action," but also acknowledged "that

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

a translocated southern sea otter colony could impact shellfish fisheries that had developed in areas formerly occupied by southern sea otters." 77 Fed. Reg. 75,266, 75,268 (Dec. 19, 2012).

23.     In 1983, the Marine Mammal Commission (which administers certain provisions of the Marine Mammal Protection Act) recommended that the Service develop a plan to translocate a California sea otter population. EIS at II-2 to II-3.

24.     In 1984, the Service identified four potential locations for an experimental otter population, one of which was San Nicolas Island, a Channel Island off the coast of Southern California. 52 Fed. Reg. at 29,785.

25.     The Service's plan to establish an experimental population, however, had two significant obstacles. First, the Service feared that it could not establish and maintain such a population consistent with the Marine Mammal Protection Act. *See id.*; EIS at 1; SEIS at 9. An uncodified provision of the Endangered Species Act provides that the Act must cede to the Marine Mammal Protection Act where the latter is more protective than the former. Pub. L. No. 93-205, § 17, 87 Stat. at 903. *See* 42 Fed. Reg. at 2967-68. The Service determined that, whereas the Endangered Species Act authorized the Service to take otters in establishing *and* maintaining an experimental population, the Marine Mammal Protection Act did not provide the authority necessary to maintain the population. *See id.* at 2968; EIS at 1.

26.     Second, the fishing community was greatly opposed to expanding the otter's range, reasonably fearing that the otter would destroy shellfish and other marine resources. *See, e.g.*, EIS at 14 (observing that, "[o]ver time, the entire commercial and sport shellfishery might be lost" if natural expansion of the otter's range were to occur). The fishing community also feared serious legal liability with an expansion of the otter's range; at the time, the Marine Mammal Protection Act did not generally provide for permits to take marine mammals from a depleted stock incidental to commercial fishing. *See* 16 U.S.C. § 1371(a)(3)(B) (1982).

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

***Public Law 99-625:  Balancing Sea Otter Recovery with Fisheries Protection***

27.     On November 7, 1986, Congress enacted Public Law 99-625, 100 Stat. 3500 (placed in the United States Code as a note to 16 U.S.C. § 1536), to balance the otter's recovery needs with the interests of fishermen.  *See* H.R. Rep. No. 99-124, at 14, 17 (May 15, 1985).  The Act authorized the Service to develop and implement "a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location." Pub. L. No. § 1(b).  The plan would have to include two zones:  a "translocation zone" where the experimental population would reside, and a "management zone," which would surround the former.  *Id.* § 1(b)(3)-(4).

28.     The dual purpose of the "management zone" was to make containment of the experimental population within the translocation zone easier, and "to prevent, to the maximum extent feasible, conflict with other fishery resources within the management zone by the experimental population."  *Id.* § 1(b)(4)(B)(i)-(ii).

29.     To achieve these purposes, Public Law 99-625 directed the Service to "use all feasible non-lethal means and measures to capture any sea otter found within the management zone and return it to either the translocation zone or to the range of the parent population."  *Id.* § 1(b)(4)(B)(ii).

30.     To harmonize the otter's Marine Mammal Protection Act and Endangered Species Act regulation, the Public Law provided:  (i) any otter found within the management zone would be deemed a member of the experimental population, *id.* § 1(b)(4); (ii) take of otter within the management zone incidental to "an otherwise lawful activity" would not constitute a violation of either the Endangered Species Act or the Marine Mammal Protection Act, *id.* § 1(c)(2); and (iii) take of otter by the Service or its agents in the course of implementing and enforcing the plan would not constitute a violation of either the Endangered Species Act or the Marine Mammal Protection Act, *id.* § 1(f).  (The California Legislature ///

enacted similar legislation tracking the provisions of Public Law 99-625. *See* Cal. Fish & Game Code § 8664.2.)

31.     Public Law 99-625 provided an express procedure for how the Service "shall implement the plan." *See* Pub. L. No. 99-625, § 1(d). The Public Law provided no authorization, much less procedure, for the Service to cease to implement the plan.

32.     Shortly after the Public Law's passage, the Service exercised its new authority to establish the otter translocation program. *See* 52 Fed. Reg. 29,754 (Aug. 11, 1987). The Service had previously determined, under the Endangered Species Act, that the translocation program would not jeopardize the species' continued existence. *See* EIS App. I at 22. *Cf.* 16 U.S.C. § 1536(a)(2).

33.     The plan authorized San Nicolas Island as the home for the experimental population, and defined the island, along with its near-shore waters, as the translocation zone. The rest of the California Bight, south of Point Conception to the Mexican border, the Service designated as the otter-free management zone. *See* 52 Fed. Reg. at 29,769. The Service acknowledged that "maintenance of this management zone free of otters is the principal mitigation feature of the proposal for fisheries and other environmental and socioeconomic impacts." 52 Fed. Reg. at 29,787.

34.     Notwithstanding the absence of authority from the Public Law, the Service included within the plan criteria for termination of the program. 52 Fed. Reg. at 29,784. *See* 50 C.F.R. § 17.84(d)(8) (1988). The Service developed these criteria in response to public comment on the proposed program. SEIS App. C at 25.

35.     In 1994, Congress passed several significant amendments to the Marine Mammal Protection Act. Among these amendments were new, permanent authorizations for allowing take of marine mammals incidental to commercial fishing. *See, as codified,* 16 U.S.C. §§ 1374(h), 1387(a). Congress also enacted a

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

special permitting regime for take of marine mammals that are protected under the Endangered Species Act. *See id.* § 1371(a)(5)(E).

36.    Because Public Law 99-625 already had established a special take regime, Congress expressly exempted the California sea otter from these new take provisions. *See id.* §§ 1371(a)(5)(E)(vi), 1387(a)(4).

### The Otter Translocation Program

37.    The Service translocated otters to San Nicolas Island from 1987 through 1990. SEIS at 1-2.

38.    During that time, the Service released 140 otters at San Nicolas Island. The fate of half is known: three died within a few days of translocation, 36 returned to the parent population, 18 were captured or found dead within the management zone, and 13 remained on the island. *See* SEIS App. C at 8. Most of the otters unaccounted for probably returned to the parent population. *Id.* As of 2011, 48 adult sea otters remained on the island, all offspring of the original translocated population. *Id.* at 13.

39.    In 1993, the Service, concerned over the effectiveness of the program's containment component, as well as its impacts on the otter, ceased to remove otters from the management zone. *See* SEIS App. C at 11.

40.    By 1998, large numbers of otters from the parent range had moved into the management zone. SEIS at 79. Since then, "otters have seasonally moved into and out of the management zone." *Id.* The Service today believes that it is likely that the otter has established a permanent breeding colony within the management zone. *Id.* at 47. *See* SEIS App. C at 28-29.

41.    In July, 2000, the Service determined, under the Endangered Species Act, that "continuing the containment program and restricting the southern sea otter to the area north of Point Conception . . . is likely to jeopardize [the otter's] continued existence." SEIS App. B at 37. *Cf.* 16 U.S.C. § 1536(b)(2).

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

42. The same month, the Service published a Notice of Intent to modify or terminate the translocation program. 65 Fed. Reg. 46,172 (July 27, 2000).

43. Shortly thereafter, the Service published a policy statement notifying the public that it would no longer capture and remove otters found within the management zone until the agency had reevaluated the translocation program. *See* 66 Fed. Reg. 6649 (Jan. 22, 2001).

44. Nevertheless, the Service continued to observe the Public Law 99-625 take exemption for "otherwise lawful activity" within the management zone. *See* SEIS App. B at 38-39.

45. In April, 2001, the Service published a Scoping Report in anticipation of completing a final evaluation of the translocation program. *See* SEIS App. E.

46. In April, 2003, the Service published a revised recovery plan, which recommended that the Service stop maintaining the management zone. Recovery Plan at 28.

47. Over the course of the next several years, the Service prepared and revised a supplemental environmental impact statement discussing various modifications, as well as possible termination, of the program. *See* 70 Fed. Reg. 58,737 (Oct. 7, 2005).

48. In 2009, The Otter Project and the Environmental Defense Center sued the Service, contending that the agency had unreasonably delayed deciding whether the otter translocation had failed and whether to maintain a "no otter" management zone. *The Otter Project v. Salazar*, No. 5:09-CV-4610-JW (N.D. Cal.). The Commission and the California Abalone Association, among other parties, intervened as defendants. The lawsuit was settled with the parties agreeing that Service would produce a revised analysis of the impacts of program modification or termination by December, 2012. *See id.* Doc. No. 66.

///

///

***Proposal to Terminate the Program***

49.   On August 26, 2011, the Service published its notice of proposed rulemaking to terminate the program.  76 Fed. Reg. 53,381.

50.   The California shellfish industry vigorously objected to the Service's proposal.  For example, Plaintiff Sea Urchin Commission protested that allowing the otter an unregulated expansion into Southern California waters would be disastrous for California's shellfish industry.  Quoting prominent otter experts, the Commission explained that, "[u]nless the sea otter is eventually contained, the State's Pismo clam, sea urchin, abalone, certain crab, and possibly lobster fisheries will be precluded."  Letter of California Sea Urchin Commission to U.S. Fish & Wildlife Service, Oct. 24, 2011, at 28-29.  The Commission also noted that, "'where sea otters have moved into . . . pristine areas . . . there has been a reduction of over 90% in numbers of shellfish,'" and that, "'[w]ithin their established range, otter foraging clearly precludes commercial fisheries for abalone and sea urchins.'"  *Id.* (citations omitted).

51.   Plaintiff Sea Urchin Commission reiterated the misgivings of the Marine Mammal Commission.   In 2006, the latter expressed concern over unregulated otter expansion, observing that it "'is likely that the southward movement of sea otters will seriously affect all shellfish fisheries in California.'"  *Id.* at 30 (quoting Letter to Ms. Diana K. Noda, Field Supervisor, United States Fish & Wildlife Service, Ventura, from Marine Mammal Commission, David Cottingham, Executive Director, Jan. 3, 2006).  The Marine Mammal Commission explained that "the abandonment of the sea otter range management could, over the long term, lead to the elimination of virtually all of the shellfish fisheries along the West Coast."  *Id.* at 36.

52.   Plaintiff Sea Urchin Commission also detailed the severe economic dislocation that termination would cause.  The sea urchin industry is California's fifth largest fishery, approximately $40 million in value.  *Id.* at 36.  The Commission

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

estimated that termination would lead to the closure of over half of the state's sea urchin processors and the disappearance of over 300 employees. That would result in a loss of nearly $7 million in wages alone to the local economy. *Id*. at 37.

### The Service's Termination Decision

53.    Notwithstanding these and other critiques, on December 19, 2012, the Service published its final decision to terminate the translocation program and to remove the take exemptions within the management zone. 77 Fed. Reg. 75,266.

54..    The Service reviewed each of the criteria it had established in enacting the translocation program. *See id*. at 75,287-89. Of the five criteria, the Service determined that only Criterion 2 had been met. *See id*. at 75,289. That Criterion provides that the program would be considered to have failed if, "within three years from the initial transplant, fewer than 25 otters remain in the translocation zone and the reason for emigration or mortality cannot be identified and/or remedied." 50 C.F.R. § 17.84(d)(8)(ii) (2012). *See* 52 Fed. Reg. at 29,784; EIS App. B at B-22 to B-23. The Service's termination decision explains that Criterion 2 has been met because (a) within 3 years of the initial transplant, only 17 otters remained on San Nicolas Island, and (b) emigration was the primary reason that fewer than 25 otters remained. *See* 77 Fed. Reg. at 75,288. *See also* SEIS App. C at 26-27.

### The Impacts of the Service's Termination Decision

55.    The Service acknowledges that, with the program's termination, "incidental take of southern sea otters in commercial fisheries cannot be authorized under the [Marine Mammal Protection Act]." 77 Fed. Reg. at 75,290.

56.    The Service concedes that termination of the program will lead to a "considerable reduction in the abundance of invertebrate prey species to depths of 25 m (82 ft)." SEIS at 86.

57.    The Service expects that termination of the program will lead to a population approaching 300 otters residing within the management zone within a ///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

decade. SEIS at 100. Consequently, sustainable shellfish and other marine fisheries in Southern California will be severely compromised if not destroyed.

## SPECIFIC ALLEGATIONS
## THAT SUPPORT INJUNCTIVE RELIEF

58.   All preceding paragraphs are realleged and incorporated herein by reference.

59.   If an injunction does not issue requiring the Service to enforce the management zone provisions of Public Law 99-625, Plaintiffs and their members will be irreparably harmed.   They will be unable to protect their livelihoods adequately from otter predation.

60.   Plaintiffs and their members have no plain, speedy, and adequate remedy at law.

61.   Plaintiffs' action is ripe and timely.

62.   If not enjoined by this Court, the Service will continue to allow unregulated otter expansion into Southern California, and will prosecute the take of otter incidental to commercial fishing within the management zone, in derogation of Plaintiffs' and their members' rights.

## SPECIFIC ALLEGATIONS THAT
## SUPPORT DECLARATORY RELIEF

63.   All preceding paragraphs are realleged and incorporated herein by reference.

64.   An actual and substantial controversy exists between Plaintiffs and the Service over the Service's authority, under Public Law 99-625 and the Administrative Procedure Act, to terminate the translocation program, to cease to enforce the management zone, and to forbid incidental take of otter within the management zone.

65.   This case is justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1    continue to cause immediate and concrete injury to Plaintiffs and their members, by

2    allowing unregulated otter expansion into Southern California fisheries, and by

3    causing them to refrain from pursuing their livelihoods for fear of prosecution for

4    take of otter.  Plaintiffs and their members have a substantial and direct interest in

5    knowing whether the Service's termination of the translocation program, including

6    its management zone and incidental take authorization therein, is legal.

7        66.    Therefore, declaratory relief is appropriate to resolve this controversy.

## CLAIM FOR RELIEF

### *Ultra Vires* Final Agency Action

### (5 U.S.C. § 706)

11       67.    Under the Administrative Procedure Act, an agency action is invalid

12   if, among other things, it is arbitrary, capricious, not in accordance with law, or in

13   excess of statutory jurisdiction or authority.  5 U.S.C. § 706(2)(A), (C).

14       68.    Through Public Law 99-625, Congress authorized the Service to

15   establish an otter translocation program.  Congress, however, mandated that any

16   such program contain a management zone. Pub. L. No. 99-625, § 1(b)(4). Congress

17   further mandated that the Service use all available non-lethal means to ensure that

18   the management zone remains otter-free. *Id.*  Finally, Congress mandated that take

19   of otter incidental to otherwise lawful activity (such as commercial fishing) be

20   allowed within the management zone. *Id.* § 1(c)(2).

21       69.    Although Public Law 99-625 provides the Service discretion in whether

22   to commence a translocation program, the Public Law provides no authority to the

23   Service to cease such program once it has been initiated.  *See id.* § 1(d) ("The

24   Secretary shall implement the plan . . . .").

25       70.    Nevertheless, the Service's December 19, 2012, rulemaking purports

26   to terminate the translocation program, as well as any obligation to enforce the

27   management zone. *See* 77 Fed. Reg. at 75,289-90. Further, the rulemaking purports

28   ///

to remove the incidental take permission for the Marine Mammal Protection Act and the Endangered Species Act. *Id.*

71.    The only authority that the Service relied on to support its rulemaking was the Service's own termination criteria, *see id.* at 75,287-89, which are the Service's invention, not Congress', *see id.* at 75,278 ("Public Law 99-625 did not address the prospect of the program's failure."). *See also* SEIS App. C at 25 ("The statute did not address the possibility of the program's failure.").

72.    Because Public Law 99-625 does not provide the Service any authority to terminate the translocation program or to make illegal the incidental take of otter within the programs's management zone, the Service's rulemaking, purporting to do the same, is arbitrary, capricious, not in accordance with law, and in excess of statutory jurisdiction and authority. *See* 5 U.S.C. § 706(2)(A), (C).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against the Service as follows:

1.    For a declaration that the Service is without authority to terminate the translocation program;

2.    For a declaration that the Service's purported termination of the translocation program is null and void;

3.    For a permanent mandatory injunction requiring the Service to enforce the management zone;

4.    For a permanent prohibitory injunction preventing the Service from holding illegal the take of otter within the management zone that is incidental to otherwise lawful activity;

5.    For an award of Plaintiffs' costs of litigation, including, but not limited to, reasonable attorney's fees and expert witness fees, and fees and costs pursuant to 28 U.S.C. § 2412, or other applicable authority; and

///

///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

6.     For such other relief as the Court may deem just and proper.

DATED:  July 29, 2013.

Respectfully submitted,

DAMIEN M. SCHIFF
JONATHAN WOOD

By _____
      DAMIEN M. SCHIFF

Attorneys for Plaintiffs

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Complaint

- 18 -

Damien M. Schiff, No. 235101
Jonathan Wood, No. 285229
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SEA URCHIN COMMISSION; CALIFORNIA ABALONE ASSOCIATION; CALIFORNIA LOBSTER AND TRAP FISHERMEN'S ASSOCIATION; COMMERCIAL FISHERMAN OF SANTA BARBARA **PLAINTIFF(S)** v. RACHEL JACOBSON, in her official capacity as Acting Assistant Secretary for Fish & Wildlife & Parks, Department of Interior; DEPARTMENT OF INTERIOR; DANIEL M. ASHE, in his official capacity as Director of the United States Fish & Wildlife Service; and UNITED STATES FISH & WILDLIFE SERVICE **DEFENDANT(S).** | CASE NUMBER **CV13-05517** ~DMG (CWx) **SUMMONS** |

TO:   DEFENDANT(S):

Rachel Jacobson            See attachment.
Acting Assistant Secretary
U.S. Fish & Wildlife & Parks
1849 C Street N.W., Washington, DC 20240

A lawsuit has been filed against you.

Within __60__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Damien M. Schiff and Jonathan Wood_, whose address is _Pacific Legal Foundation, 930 G Street, Sacramento, California 95814_____.   If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____         By: _____
                                                        Deputy Clerk

                                                     *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

Attachment to Summons

To Defendants:

U.S. Department of Interior
1849 C Street N.W.
Washington, DC  20240

U.S. Fish & Wildlife Service
1849 C Street N.W., Room 3331
Washington, DC  20240

Daniel M. Ashe
Director
U.S. Fish & Wildlife Service
1849 C Street N.W., Room 3331
Washington, DC  20240

Andre Birotte Jr.
U.S. Attorney's Office
Central District of California
312 North Spring Street, Suite 1200
Los Angeles, CA  90012
Attn: Civil Process Clerk

Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530-0001

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| California Sea Urchin Commission; California Abalone Association; California Lobster and Trap Fishermen's Association; and Commercial Fishermen of Santa Barbara | Rachel Jacobson, in her official capacity as Acting Assistant Secretary for Fish & Wildlife & Parks, Department of Interior; Department of Interior; Daniel M. Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service; and U.S. Fish and Wildlife Service |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|
| Damien M. Schiff, No. 235101<br>Jonathan Wood, No. 285229<br>Pacific Legal Foundation<br>930 G Street, Sacramento, CA 95814          (916) 419-7111 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding  ☐ 2. Removed from State Court  ☐ 3. Remanded from Appellate Court  ☐ 4. Reinstated or Reopened  ☐ 5. Transferred from Another District (Specify)  ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Administrative Procedure Act, 5 U.S.C. §§ 701-706

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☒ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13-05517

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Ventura County, Santa Barbara County | Sacramento County |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☒ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose. **NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Ventura County | District of Columbia |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____ DATE: July 29, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |